# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| ANTONIA DEMETRUS GILBERT,  )<br>)<br>Petitioner,  )<br>)<br>v.  )<br>)<br>THEODIS BECK,  )<br>)<br>Respondent.  ) | 1:07CV597 |

## MEMORANDUM OPINION AND ORDER

**SHARP, Magistrate Judge**

Petitioner Antonia Demetrus Gilbert, a prisoner of the State of North Carolina, has brought a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. (Docket No. 2.) On April 26, 2004, a jury in Davidson County, North Carolina convicted Petitioner of felonious speeding to elude arrest and having the status of a habitual felon. He was then sentenced to 80 to 105 months in prison. Petitioner was represented at trial by James E. Snyder, Jr.

Petitioner did pursue a direct appeal, but was ultimately unsuccessful in that endeavor. *State v. Gilbert*, No. COA04-1227, 2005 WL 1576868 (N.C. App.), *rev. denied*, 360 N.C. 70, 622 S.E.2d 115 (Oct. 6, 2005)(unpublished). Petitioner also sought collateral review in the state courts by filing a motion for appropriate relief. When the motion for appropriate relief was summarily denied, Petitioner then filed a petition for certiorari with the North

Carolina Court of Appeals. That petition was denied on August 28, 2006. Petitioner next sought review of his conviction in this Court by filing a petition for habeas corpus dated May 21, 2007. That petition was dismissed *sua sponte* on June 7, 2007 as being deficient. *Gilbert v. Cooper*, 1:07CV416 (M.D.N.C. June 7, 2007)(unpublished). The dismissal was without prejudice to Petitioner filing a petition that corrected the deficiencies. Petitioner then submitted a second petition dated August 8, 2007. Respondent has since filed a motion to dismiss the petition for being untimely filed (Docket No. 4) and a motion for summary judgment (Docket No. 12). An evidentiary hearing was also conducted in the case on August 14, 2008. Following the hearing, Respondent's motions are now before the Court for rulings.

## Claims of the Petition

Petitioner claims that his federal constitutional rights were violated because (1) he was denied the right to present witnesses and evidence on his behalf, (2) his attorney provided him with ineffective assistance of counsel primarily by failing to honor Petitioner's request that Albert Lucas, Jr. be subpoenaed and called as a defense witness, (3) he was subjected to a vindictive prosecution by being charged as a habitual felon, and (4) the habitual felon charge was flawed in that it did not list a charge other than being a habitual felon. (Docket No. 2.)

**Factual Background From the Trial**

The North Carolina Court of Appeals summarized the evidence adduced at Petitioner's trial as follows:

> The State's evidence at trial tended to show that on 7 September 2003, Officer Tony Lewis (Officer Lewis) of the Thomasville Police Department and a reserve officer with whom he was working, were driving in a marked patrol vehicle on Culbreth Avenue in Thomasville. As they drove down Culbreth Avenue, a woman standing in her front yard screamed for them to stop. Officer Lewis stopped the patrol vehicle and had a conversation with the woman. Defendant was standing near Officer Lewis and the woman throughout their conversation. Officer Lewis asked defendant to "hold up" so that he could speak with him. Defendant replied, "I'm not talking with you," and got into his car. Officer Lewis again asked defendant to "hold up." Defendant replied "No" and drove away down the wrong lane of Culbreth Avenue at a high rate of speed. Officer Lewis then got into his patrol vehicle to pursue defendant for careless and reckless driving. As soon as Officer Lewis began pursuit of defendant, he turned on his blue lights and siren.
>
> Defendant drove down the wrong lane on Culbreth Avenue for approximately 150 feet. He moved into the correct lane and turned right onto Cable Street, a residential street, without signaling. Defendant's speed continued to increase, and his tires squealed. Defendant's car fishtailed as he went around a ninety-degree turn halfway down Cable Street. Officer Lewis believed that defendant was speeding approximately fifty miles per hour down Cable Street, which had a posted thirty-five mile per hour speed limit and was populated with people at the time. Defendant failed to stop for the stop sign at the intersection of Cable Street and Memorial Park, and continued to squeal his tires. Officer Lewis estimated that defendant's speed reached seventy miles per hour on Memorial Park.
>
> Defendant made a right turn on Unity Drive, and Officer Lewis again observed defendant squealing his tires. Officer Lewis estimated that defendant was driving seventy miles per hour down Unity Drive. An event was being held at Finch Auditorium on Unity Drive that evening, which increased the traffic and the number of pedestrians on the sidewalk. Officer Lewis pursued defendant down Unity Drive and onto Bulldog Drive, which led to

Thomasville High School. Defendant voluntarily stopped in the parking lot of Thomasville High School.

Throughout the pursuit, Officer Lewis never lost sight of defendant. Officer Lewis testified that he was certified to operate radar equipment, and that his radar equipment was properly calibrated for accuracy at the time of the pursuit. During the pursuit, Officer Lewis's radar equipment showed that defendant was traveling seventy miles per hour on several thirty-five mile per hour streets, including residential areas and school zones.

*Gilbert*, 2005 WL 1576868, at *1-2.

## Testimony from the Evidentiary Hearing

As already noted, the Court held an evidentiary hearing on August 14, 2008. The purpose of that hearing was to allow the parties to present evidence addressing Petitioner's allegation in his second claim for relief that his trial attorney failed to investigate, procure, and call Albert Lucas, Jr. as a defense witness at trial. Petitioner, who was represented by counsel at the hearing, testified on his own behalf, along with Lucas. Respondent called Officer Lewis, Officer Brandon Weidner, and Attorney James Snyder as its witnesses. The relevant portions of their testimony are as follows.

Petitioner first testified about Snyder's actions in the case. He stated that he had little contact with Snyder despite attempts to call him. (Hrg. Tr. at 6-7.) Petitioner asserted on the witness stand that he never spoke to Snyder about any discovery materials or police interviews. He added that Snyder did not ask him about witnesses even when Petitioner told him about Lucas. (*Id*. at 10-11.) Snyder did not, as far as Petitioner knew, interview Charlene Dow, the woman who first flagged down Officer Lewis. (*Id*. at 14.)

-4-

On Friday, April 23, 2004, Petitioner received a call from Snyder stating that he had a plea offer. Petitioner proclaimed his innocence to the charges and rejected the offer. The case then went to trial the following Monday. Petitioner stated that he spoke with Snyder before the trial and implored him to seek a continuance so that they could prepare for trial. He also testified that he told Snyder about Lucas, who was riding as a passenger in his car at the time he was stopped by Lewis. No continuance was granted and Petitioner proceeded to trial. (*Id*. at 9, 12-13.) The only witness was Officer Lewis. Petitioner did not testify in his own defense at trial because Snyder advised him that doing so would allow his past record to be presented to the jury.[1] (*Id*. at 15.)

Although he did not testify at his trial, Petitioner strongly disagreed with the accuracy of Lewis' version of events. He denied driving recklessly, speeding, or eluding officers. He admitted that Lewis asked him to stop and talk, but he claimed that there was never any reason for him to speak with Lewis. (*Id*. at 21.) He asserted that he obeyed all traffic laws at all times as he left Dow's residence. He also stated that no event was being held at the high school or adjacent auditorium where he was stopped. (*Id*. at 21-22.) Petitioner testified that Lucas, who had been his friend since childhood, would have been willing to testify to these events in his defense. (*Id*. at 22.)

---

[1] Petitioner agreed during his testimony that he had a number of prior drug related felonies on his record. (Hrg. Tr. at 24-31.)

-5-

Case 1:07-cv-00597-PTS   Document 19   Filed 10/16/08   Page 5 of 19

Petitioner's next witness was Albert Lucas. Essentially, Lucas did testify on direct examination as Petitioner stated that he would. He claimed that on September 7, 2003, he and Petitioner went to see Charlene Dow, who was the mother of Petitioner's baby. Lucas was unclear about the time of day when this occurred, first stating that he did not recall the time of day, then stating that it was around 3:30 or 4:00, and then stating that they were there at 8:00 in the evening. (*Id*. at 36.)

Lucas testified that he stood outside while Petitioner went in to see Dow. When Petitioner and Dow came out of the house, she waved down a passing patrol car. Lucas stated without explanation that he was sitting in the passenger seat of Petitioner's car, as opposed to standing outside, when this occurred. (*Id.* at 36.) He claimed that Petitioner got into the car, that he never heard any conversation between Petitioner and the police officers, and that they then left the area. (*Id*. at 37.) Lucas testified that Petitioner never exceeded the posted speed limits as he left. He never noticed the police car or any blue light behind them until less than a minute before Petitioner pulled into the high school parking lot. This was so despite the fact that it was fairly dark. (*Id*. at 37-40.) Lucas claimed never to have heard a siren. (*Id*. at 42.) As Petitioner pulled into the parking lot, six police cars arrived at one time. Petitioner was then "snatched" from the car by officers, who broke the door handle in the process. (*Id*. at 41.) Finally, Lucas stated that he would have been willing and able to come to Petitioner's trial to give this testimony if he had known that it was taking place. However, he was not contacted by Snyder. (*Id*. at 43-44.)

-6-

Case 1:07-cv-00597-PTS   Document 19   Filed 10/16/08   Page 6 of 19

On cross examination, Lucas agreed that he and Petitioner were close friends to the point that they were like brothers. (*Id*. at 45.) He also admitted that he too had a number of criminal convictions which would have been admissible had he testified at Petitioner's trial. Specifically, he had two convictions for possession with intent to sell and deliver cocaine, a conviction for Class A misdemeanor assault on a female, and a conviction for felony larceny.[2] (*Id*. at 47-52.) Shortly after Petitioner's trial, Lucas also got another felony conviction for felony possession of cocaine. (*Id*. at 47.) Lucas was the final witness for Petitioner.

Respondent called three witnesses. The first of these was Officer Tony Lewis of the Thomasville Police Department. He testified regarding the events surrounding Petitioner's arrest and largely contradicted the testimony of Petitioner and Lucas. He stated that he was on routine patrol when Charlene Dow, who was sitting in her yard, waved for him to stop. He described her as hysterical and screaming. Lewis spoke to her and was told that she had been assaulted by Petitioner, who was her boyfriend or ex-boyfriend. (*Id*. at 54.) Lewis then asked to speak with Petitioner, who responded that he did not have to talk to Lewis. Petitioner got into his car and drove away from the scene. Lewis testified that Petitioner left the scene traveling 35-40 miles per hour in a 35 mile per hour zone. He also spun his tires,

---

[2] Lucas stated that he did not remember a larceny conviction, but records produced by Respondent at the hearing showed that he did have such a conviction. (Hrg Tr. at 49; Resp. Ex. 2.)

-7-

fishtailed, and drove on the left side of the road. Lewis and another officer who was accompanying him pursued Petitioner with lights and siren activated. Lewis also called in on the radio that he was initiating a traffic pursuit. (*Id*. at 54-55.)

As Lewis pursued Petitioner, he observed him go through a 90-degree curve at 45 or 50 miles per hour, crossing left of center and nearly losing control. Petitioner then ran a stop sign and made a right turn, nearly causing a collision with another car. Petitioner sped up, reaching 70 miles per hour in a 35 mile per hour zone. Lewis measured Petitioner's speed using his own speedometer, which he double-checked against his radar. (*Id*. at 55-56.) Eventually, Petitioner passed the auditorium and turned into the adjacent high school parking lot, where he stopped. Lewis testified that there was foot traffic on the sidewalks at that time, as well as 200-300 cars in the auditorium parking lot. (*Id*. at 58-59.) Six other officers also arrived and Petitioner was taken into custody. (*Id*. at 59.) Lewis was not contacted by Snyder prior to Petitioner's trial, but spoke to him briefly on the day of the trial. (*Id*. at 62.)

Respondent next called Officer Brandon Weidner, also of the Thomasville Police Department. He was on routine patrol on the day Petitioner was arrested. Weidner set out in an attempt to intercept Petitioner after he heard Lewis call over the radio that he was involved in an active vehicle chase. He arrived on the scene after Petitioner had stopped his car. Weidner testified that there were cars and people in the parking lot and that an event was being held at the school or auditorium. (*Id*. at 77-79.)

-8-

Case 1:07-cv-00597-PTS   Document 19   Filed 10/16/08   Page 8 of 19

Finally, Respondent called attorney Snyder. Snyder testified that he represented Petitioner, but that he had little or no recollection of the representation due to the passage of time and the volume of cases he handles. He did review his file, but still had no real recollection of the representation. (*Id*. at 82.) Although he testified about his normal methods for handling criminal cases, he did not say how they were applied in Petitioner's case. His file contained a few documents and records, including two letters advising Petitioner of the pending trial, a jury selection sheet, and a copy of Lewis' police report in the case. There is no mention of Lucas in the file and Snyder had no independent recollection of Lucas. (*Id*. at 92-93.) The file showed that Snyder met with Petitioner or talked to him on the telephone on several occasions between Petitioner's arrest and his trial. However, the subject matter of those conversations was not recorded in the file beyond a note that said Petitioner would only accept a "class" or fine as a plea offer. (*Id*. at 101-102.)

Snyder testified that his trial strategy was a "hunker down" tactic that involved letting the officers testify and then attempting to make a winning final argument. (*Id*. at 94.) He stated that he would not have encouraged Petitioner to testify due to his record. He could not recall an instance in his thirty-seven years of practicing law where a defendant with a record like Petitioner's had testified and won. (*Id*.) Snyder's testimony concluded the testimony at the evidentiary hearing.

## Discussion

**A.     Motion to Dismiss**

As noted above, Respondent has filed a motion to dismiss based on the defense that the habeas petition was not timely under 28 U.S.C. § 2244(d)(1). According to Respondent, the initial petition, which was dismissed for procedural deficiencies, was timely filed, but the current petition was not. Based on some of the out-of-circuit precedent cited in Respondent's supporting brief, its argument is questionable.[3] However, the Court need not decide the issue because the petition can be decided on its merits pursuant to Respondent's motion for summary judgment.

**B.     The Habeas Corpus Standard of Review**

Respondent's motion for summary judgment must be decided under the statutory standards set by Congress. Pursuant to 28 U.S.C. § 2254(d), an application for a writ of habeas corpus shall not be granted with respect to any claim that was adjudicated on the merits in state court unless the adjudication (1) resulted in a decision that was contrary to, or involved an unreasonable application of, federal law clearly established by the Supreme Court, or (2) resulted in a decision that was based upon an unreasonable determination of the

---

[3] The reasoning in one recent unpublished Fourth Circuit case might also call the argument into question. *United States v. Boyd*, 275 Fed. Appx. 196 (4th Cir. 2008).

facts. Further, a determination of factual issues by the state court shall be presumed correct, and can be rebutted only by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

**C.     Claim One**

Petitioner's first claim for relief is that he was denied the right to present witnesses and evidence on his behalf. This claim is not well-explained, but is fully contradicted by the record in the case. Petitioner was afforded a trial by the State. He certainly had the opportunity to present witnesses and evidence at that trial. His attorney did not do so, but no action by the State caused this.[4] Petitioner's claim is conclusory and contradicted by the record. For these reasons, the claim is denied.

**D.     Claim Three**

Petitioner's third claim for relief alleges that he was subjected to a vindictive prosecution because he was prosecuted for felony speeding to elude arrest as a habitual felon when he should have faced only a misdemeanor speeding charge. It has long been the rule that prosecutors have great leeway in charging and plea bargaining situations. *Bordenkircher v. Hayes*, 434 U.S. 357, 364 (1978). In that case the Supreme Court noted that the decision of what charge to file generally is in the prosecutor's discretion as long as "the prosecutor has probable cause to believe that the accused committed an offense defined by statute" and

---

[4] To the extent that this is an allegation that Petitioner's attorney improperly failed to put on any witnesses or evidence, this point will be addressed in conjunction with Petitioner's ineffective assistance claim.

-11-

does not base the charging decision on a factor such as race, religion, etc. *Id*. Here, based on the facts and Petitioner's record, the prosecutor brought the felony speeding to elude arrest and habitual felon charges before the grand jury, which then found that probable cause existed to indict Petitioner. The prosecutor simply charged Petitioner with violations supported by the evidence and then continued to trial when Petitioner rejected the plea offer. There is no hint that the prosecutor's decision was in any way related to one of the impermissible factors mentioned in *Bordenkircher*. There is, therefore, no basis in the record for Petitioner's third claim for relief. The claim is without merit.

**E.     Claim Four**

Petitioner's fourth claim for relief asserts that his habitual felon indictment was flawed because it did not reference a "principle charge." In other words, it did not reference the underlying charge of felony speeding to elude arrest, but instead charged Petitioner only with being a habitual felon.

Although Petitioner's description of the nature of the indictment may be correct, he is not entitled to relief on this claim. Ordinarily, deficiencies in state court indictments will not entitle a petitioner to habeas relief unless the flaw is serious enough that it made the proceedings so egregiously unfair that a petitioner was deprived of due process. *Ashford v. Edwards*, 780 F.2d 405, 407 (4th Cir. 1985). Petitioner claims that the indictment should have given him notice of the pending felony charge underlying the habitual felon indictment. However, he does not claim that he did not have actual notice of the underlying felony. In

-12-

fact, the record is clear that Petitioner did have such notice because that underlying felony was set out in a separate indictment. (Docket No. 5, Ex. 3 at 10.) More importantly, Petitioner went to trial and mounted a defense against both the speeding to elude arrest and habitual felon charges. He does not explain how the structuring of the indictments produced any unfairness in his case. Respondent's motion for summary judgment is granted as to this claim as well.

**F.     Claim Two**

The only remaining claim for relief is Petitioner's claim of ineffective assistance of counsel. The centerpiece of this claim is the allegation that Attorney Snyder failed to call Albert Lucas as a witness even though Petitioner told him that Lucas was a witness and asked that he be called.[5] To establish a Sixth Amendment claim such as that attempted here, Petitioner must show (1) a dereliction of counsel and (2) a reasonable probability of a different outcome but for counsel's error. *See Strickland v. Washington*, 466 U.S. 668 (1984).

Certain facts related to Petitioner's second claim are clear, with the main one being that Snyder never interviewed, contacted, or subpoenaed Lucas. Petitioner testified that he told Snyder about Lucas and Snyder could not testify definitively one way or another on this

---

[5] Portions of the petition also make it appear that Petitioner may be attempting to raise other ineffective assistance of counsel claims, including a claim of ineffective assistance of appellate counsel. To the extent that this is so, those claims are entirely conclusory. They are denied as such.

-13-

point. It could also be argued that any attorney should ask a client about the possible existence of any eyewitnesses when preparing for trial whether or not the client volunteers that witnesses exist.[6] The Court will assume without deciding that failing to identify and interview an eyewitness could constitute deficient performance by counsel.

Even if there was deficient performance in this case, Petitioner must still show prejudice. Respondent argues in his summary judgment brief that Petitioner raised his ineffective assistance of counsel claim in his motion for appropriate relief in state court and that the Davidson County Superior Court's rejection of that claim was neither contrary to nor an unreasonable application of established Supreme Court precedent. A closer review of the record reveals both that Petitioner did raise his claim in his motion for appropriate relief and that he supported it with an affidavit from Lucas. (Docket No. 5, Ex. 8, Ex. K.) The Superior Court rejected the claim by stating simply that "Petitioner has failed to allege new grounds sufficient for the relief requested; and there is nothing to be heard." (*Id.*, Ex. 9.) Respondent asserts that this statement must have included an implicit finding that Lucas' testimony at trial would not have been credible.

The Court agrees that the ruling on the motion for appropriate relief must have included a credibility finding. However, such a finding made only based on affidavits

---

[6] At the very least, Snyder became aware of the existence of an eyewitness when, during trial, Lewis made mention of a passenger in Petitioner's car. (Docket No. 13, Ex. 2 at 26-27.) Snyder did not inquire further or attempt to get a continuance to investigate the witness at that time.

-14-

without a hearing can be problematic. Although such findings are allowable at times, a review of the case law cited by Respondent reveals that those times may be limited to instances where an "affidavit is cryptic or conclusory with respect to a contested issue of fact," while a competing version of events is complete and detailed. *Strong v. Johnson*, 495 F.3d 134, 140 (4th Cir. 2007). Lucas' affidavit in the present case was no work of art in some respects. However, it did contain a certain level of specificity and detail on key points. It was for this reason that this Court ordered the evidentiary hearing to examine Lucas' testimony and credibility further. Having now conducted the hearing to take Lucas' testimony, the Court will now use that evidence to assess the state court's implied credibility determination.

As it turns out, there are numerous problems with Lucas' testimony, both by itself and when compared to his earlier affidavit and to the testimony of Officer Lewis. Beginning with the affidavit, Lucas made the much more credible statement in the affidavit that the entire incident began with Petitioner and Dow arguing in her yard. Dow then flagged down Officer Lewis by yelling to the officer and moving her hands. Lucas stated that the officer stopped and questioned both Dow and Petitioner before Petitioner said that he was not going to stand there and argue and then went to the car where Lucas was sitting. In contrast, Lucas testified at the evidentiary hearing that he heard no conversation between Petitioner and the police officers and that Petitioner and Dow were not fighting. He claimed that they were inside, that he was outside, and that he did not hear a fight. He gave no explanation as to why Dow,

-15-

with no reason or provocation whatsoever, would have suddenly flagged down a police officer. His live testimony contradicts his earlier affidavit and is actually much less credible on this point.

Lucas' live testimony also suffered from a number of other problems. First, he made inconsistent statements about the time of day when events occurred. Second, he initially stated that he was standing outside the house while Dow and Petitioner were inside the house. He then later claimed that he was in the passenger seat of Petitioner's car at the time Dow flagged down Officer Lewis so that he could not hear any conversation between Petitioner and Lewis. Lucas also failed to remember that any event was taking place at the school auditorium, a fact confirmed by both Lewis and Weidner. Even though Petitioner supported Lucas on this point, the officers' testimony and descriptions of the scene were far more detailed and credible.

Lucas additionally claimed that Petitioner obeyed all traffic laws, did not speed at all, and did not ignore a blue light or sirens while driving away from Dow's house. Lewis, of course, testified that Petitioner acted in an opposite manner. Lewis' testimony on this point is far more credible. It is dubious that Petitioner, who was leaving an emotionally charged domestic dispute against the verbal requests of a police officer, would have left in as calm a manner as Lucas' described. In any event, Lucas' claim that Lewis did not have his lights or sirens on or that he and Petitioner did not see the lights until just before Petitioner stopped, is not believable. It is undisputed that Lewis sought to speak with Petitioner because

Petitioner was the suspected assailant in a reported domestic dispute. Under the circumstances described by Lewis, he had every right to detain Petitioner to investigate further based on reasonable suspicion.[7] Whether or not Petitioner sped away from the scene spinning his tires and breaking other traffic laws, Lewis would almost certainly have sought to stop him immediately by activating his lights and siren.[8]

Lewis testified that he immediately called in a traffic pursuit as he began driving after Petitioner. This would explain how six police cars converged upon Petitioner's location just as he finally pulled to a stop. Even Lucas conceded that this occurred. The call for backup and the response to that call is far more consistent with a chase as described by Lewis than with a mere decision to follow Petitioner with no lights and siren and then suddenly decide to pull him over even though he was obeying all traffic laws. Obviously, Lewis made the call for backup early on. It is not clear why he would have done this unless Petitioner was fleeing in the dangerous manner described by Lewis.

Finally, there are inherent credibility problems with Lucas' testimony. He and Petitioner are longtime friends who have known each other since childhood. He agreed on

---

[7] *See, e.g., United States v. Foreman,* 369 F.3d 776, 781-82 (4th Cir. 2004)(discussing the standards for investigative stops generally).

[8] Counsel for Petitioner mentioned in closing arguments that the failure to hear the siren could have been caused by some noise in the car such as a stereo or loud conversation. However, there was no evidence of any such noise or distraction. It also would not explain how Petitioner could not see flashing blue lights in the darkness.

-17-

the stand that they were almost like brothers. Even more importantly, Lucas has an extensive criminal record. This not only hurts his credibility in the present proceeding, but would have damaged it severely had he been called in front of the jury at Petitioner's trial. Petitioner's similar record was sufficient for Snyder to make the entirely reasonable decision to keep him off the stand. Lucas would have suffered from very similar credibility problems due to his record and his close relationship to Petitioner.

Overall, the Court concludes that Lewis' version of events was highly credible. Lucas' testimony, on the other hand, contradicted his earlier sworn statements, defied common sense in certain respects, and was overshadowed by his past record and his close relationship with Petitioner. Because of the sizeable credibility gap between Lewis and Lucas, there is not a reasonable probability that the presentation of Lucas' testimony at Petitioner's trial would have produced a different result. The testimony was not sufficient to undermine confidence in the jury's guilty verdict. *Emmett v. Kelly*, 474 F.3d 154, 170 (4th Cir.), *cert. denied*, ___ U.S. ___, 128 S.Ct. 1 (2007). Therefore, the state court's ultimate decision to deny Petitioner's motion for appropriate relief was not, in the end, contrary to or an unreasonable application of established Supreme Court precedent. It was also not factually erroneous. Petitioner's second claim for relief will be denied and Respondent's summary judgment motion will be granted as to all claims.

**IT IS THEREFORE ORDERED** that Respondent's motion to dismiss (Docket No. 4) is **DENIED**, that Respondent's motion for summary judgment (Docket No. 12) is

**GRANTED,** and that the petition for habeas corpus (Docket No. 2) is **DENIED** and dismissed.

A separate judgment dismissing this action with prejudice will be entered contemporaneously with this Memorandum Opinion and Order.[9]

/s/ P. Trevor Sharp<br>
United States Magistrate Judge

Date: October 16, 2008

---

[9] The parties have consented to the jurisdiction of the Magistrate Judge, and this matter has been referred to the undersigned for all proceedings. *See* 28 U.S.C. § 636(c).